**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:19-CR-559-2 |
| | ) | |
| v. | ) | JUDGE SARA E. LIOI |
| | ) | |
| DEEPAK RAHEJA, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED SENTENCING MEMORANDUM OF DEFENDANT

## HAYSLETTE

Now comes Defendant Gregory Hayslette (hereinafter "Mr. Hayslette" or "Hayslette"), by and through undersigned counsel, and hereby submits the following Sentencing Memorandum in advance of his sentencing hearing, set for 10:00 AM on April 24, 2023.[1]  On March 2, 2022, Mr. Hayslette pled guilty to one count of the Indictment in this case, namely conspiracy to violate the anti-kickback statute, in violation of Title 18, United States Code, § 371.  For the reasons stated herein, and consistent with Paragraph 14 of Mr. Hayslette's Plea Agreement (ECF No. 187 at p. 4), Mr. Hayslette respectfully asks this Court to fashion a sentence consistent with the guidelines set forth in Title 18, United States Code, § 3553, and the information provided below, namely a non-incarceratory sentence of twelve months home confinement and probation.

## I.     INTRODUCTION

Mr. Hayslette regrets his actions and is remorseful for the harm he has caused. He accepts responsibility for his conduct and is prepared to accept the consequences of his behavior and the

---

[1] This Sentencing Memorandum and the exhibits hereto contain sensitive personal information regarding Mr. Hayslette and/or his family.

sentence of this Court.  The criminal conspiracy at issue in this matter was implemented, perfected, and in place long before Mr. Hayslette began his employment at Avanir Pharmaceuticals, Inc. ("Avanir").[2]  Although Mr. Hayslette was a participant in the unlawful activities, he was neither a leader nor an organizer of Avanir's coordinated and directed policy of encouraging doctors through illegal kickbacks and off-label sales to prescribe Neudexta.  Rather, Mr. Hayslette was a new salesman who was directed and encouraged by co-defendant Frank Mazzucco ("Mazzucco"), and other Avanir senior leadership (directly and indirectly) to implement Avanir's long-established unlawful sales methods.[3]  The *Qui Tam* filed in this matter was filed on March 27, 2015. Mr. Hayslette was hired by Avanir in June 2015, long after the actions painstakingly demonstrated by the relator led to a coordinated effort by Avanir employees and co-defendant Raheja to engage in a "kickback scheme."[4]  In fact, by the time Mr. Hayslette was out of training and fully employed by Avanir in July 2015, Avanir had paid prescribing physicians via speaking engagement fees and other payments in exchange for increased prescription writing in the Northern District of Ohio and beyond for approximately four and a half years.[5]  Even as Mr. Hayslette began selling Avanir products and became involved in Avanir's program, Mr. Hayslette was a junior salesman with zero reports, and reported to Mazzucco who was regularly advised of Mr. Hayslette's actions via detailed and regular text messages and approved all of Hayslette's actions, and in some cases, was present for speaker dinners and other key elements of the conspiracy.

---

[2] *See* Plea Agreement, ECF No. 187, at ¶ 23.
[3] *See* Presentence Investigation Report ("PSR"), ECF No. 255, at ¶¶ 32, 35, 53-54, 57, 61, 63; Plea Agreement at ¶¶ 27, 33, 35, 39, 41, 47.
[4] Complaint, *United States of America, ex rel., Kevin Manieri v. Avanir Pharmaceuticals and Deepak Raheja*, No. 5:15-cv-00611 (N.D.Ohio Mar. 27, 2015), ECF No. 1.
[5] *See* Plea Agreement, ECF No. 187, at ¶ 23.



Also, Mr. Hayslette lacks a criminal history.

Perhaps most persuasive, and as explained below, other similarly situated "Insys" defendants in a comparative conspiracy involving opioids have received non-incarceratory sentences.  In this case, Mr. Hayslette's supervisor received eight months of home confinement, four years of probation, a $5,000 fine, a $100 special assessment, and restitution.  A sentence of probation is fair, just, and reasonable under the facts and circumstances of this case, and the applicable principles of federal sentencing law.

## II.    RELEVANT BACKGROUND

Nuedexta is a drug FDA approved to treat Pseudobulbar Affect ("PBA").  PBA is characterized by involuntary, sudden, and frequent episodes of uncontrollable laughing and crying. Avanir's method of selling Nuedexta included incentivizing doctors through paid speaking programs at which doctors paid by Avanir would speak about and promote Nuedexta, typically at dinners or other similar events. According to the government, and as described in the relator case, Avanir and Raheja engaged in a kickback conspiracy beginning around February 2011.[7] Approximately four and a half years later, in June 2015, Mr. Hayslette was hired as a sales

---

[7] *See* Plea Agreement, ECF No. 187, at ¶ 23.

representative for Avanir.  Mr. Hayslette began his tenure at Avanir at the bottom of the corporate hierarchy.  He did not have any direct reports and was the lowest level employee in Ohio.  There were at least four layers of management between Mr. Hayslette and the CEO of Avanir, all of whom were employed at Avanir long before Mr. Hayslette started, and who provided guidance and leadership on a host of issues, including the manner and means to unlawfully sell and market to prescribers Nuedexta.  For its role in off-label prescribing and incentivizing unnecessary prescriptions nationwide, Avanir Pharmaceuticals agreed to a $108 million settlement and entered into a Corporate Integrity Agreement with DOJ and the Department of Health and Human Services Office of Inspector General.[8] A similar kickback conspiracy was settled in the Northern District of Georgia, and Avanir entered into a Deferred Prosecution Agreement.[9] The government declined to prosecute any individual corporate executives or senior leadership of the company.

Mr. Hayslette spent his first few weeks at Avanir training under Bill Stackhouse ("Stackhouse") and Divya Ravel ("Ravel"), both of whom held the sales representative position prior to Mr. Hayslette and were promoted to senior executive positions within Avanir. Both worked at Avanir with Mazzucco for a significant period before Mr. Hayslette was hired. Stackhouse told Mr. Hayslette, in his first month at Avanir, that Dr. Raheja and others demanded lavish dinners and extravagant wine as part of the doctors' expectation to be feted, wined, and dined by Avanir sales representatives to write prescriptions.  Stackhouse elaborated that the extravagant spending may have been in violation of company policy, but most sales representatives were trained to find ways to justify the spends and that their supervisors and senior management

---

[8] "Pharmaceutical Company Targeting Elderly Victims Admits to Paying Kickbacks, Resolves Related False Claims Act Violations," DOJ Press Release, September 26, 2019, *available at* https://www.justice.gov/opa/pr/pharmaceutical-company-targeting-elderly-victims-admits-paying-kickbacks-resolves-related (last accessed February 14, 2023).
[9] *Id.*

were aware of, and in many cases attended, such lavish dinners. Further, Stackhouse explained to Mr. Hayslette that senior management expected sales representatives to do whatever it took to keep high-prescribing doctors like Raheja happy, because that was endemic to Avanir's culture and marketing strategies.

Mazzucco was aware of this practice and attended at least one program that exceeded the *per diem* limit.[10]  On another occasion, Mazzucco himself invited a vendor to a program and explicitly instructed Hayslette to omit the vendor's name from the program form.  Mazzucco worked for Avanir for years before Mr. Hayslette and was responsible for the day-to-day management and supervision of Mr. Hayslette's work.  He was a hands-on supervisor who frequently checked-in on Mr. Hayslette and directed his engagement with doctors and staff.  Every program was approved by Mazzucco and other supervisors, and the program was audited by Avanir's compliance team, which reviewed the bookings and participated in at least one speaker dinner.

As detailed in the Indictment, the PSR, and the related *Qui Tam* Complaint, Avanir and Raheja had a long-standing relationship and unlawful practice dating back to 2011.[11]  Raheja was a top-ten prescriber in the country and a frequent speaker for Avanir *prior* to Mr. Hayslette's tenure.  Mazzucco told Mr. Hayslette in an October 5, 2015 text message, "[i]n fairness to you, the monster had already been created. He is just bigger now." Upon Mr. Hayslette's hiring, Mazzucco, Sales Director Denise Prindiville ("Prindiville") and others introduced him to Raheja, and instructed Mr. Hayslette to "keep Dr. Raheja happy," no matter the cost, and to conduct speaker programs whenever Raheja wanted to do so.

---

[10] *See* Plea Agreement, ECF No. 187, at ¶ 32.
[11] Indictment, ECF No. 1, at ¶ 21; PSR at ¶ 23; Complaint, *supra* note 3.

Similarly, Mr. Hayslette understood from Mazzucco and others that his success at Avanir was predicated on maintaining the relationship with Raheja and creating new relationships with other doctors. Although Mr. Hayslette knew that Raheja was compensated for the speaker program, he was not privy to the details or mechanics of that portion of the business. Avanir leadership, including Senior Vice President of Sales Michael McFadden ("McFadden"), Prindiville, Mazzucco, and others, met with Raheja and excluded Hayslette from those meetings.

Mr. Hayslette worked at Avanir for a relatively short time, approximately 15 months, and only seven months before federal agents executed search warrants in February 2016 (and he immediately ceased calling on the defendants in this matter and hosting speaker programs following the execution of the warrant). Mr. Hayslette's compensation structure was based on growth of new prescriptions, not the maintenance of existing levels. He was directed by Mazzucco and others to bring in new doctors and to keep the prescriptions flowing. As a new employee, he was categorically ineligible for many of Avanir's incentive sales programs.

During his short tenure, Mr. Hayslette did not independently engage in any activity that was not approved, directed, and/or encouraged by his superiors. For example, in late 2015, Avanir rolled out a national campaign that instructed its sales representatives to suggest to doctors in their region that they prescribe in 90-day quantities, rather than the standard 30-day amounts, to bolster holiday numbers. Mr. Hayslette simply did as he was told.

Mr. Hayslette did not exert control over any doctors' actions or decision-making related to prescriptions. At all times, doctors had ultimate and sole decision-making authority as to whether to prescribe Nuedexta. By touting the effectiveness of Nuedexta and encouraging Raheja and others to recommend its use to other doctors, Mr. Hayslette was acting squarely within his job description, as directed by his superiors at Avanir. In comparison to his superiors who designed,

implemented, and perfected the kickback system long before Mr. Hayslette worked at Avanir, and the doctors who made all prescribing decisions and, in Raheja's case, received significant and direct remuneration from Avanir, Mr. Hayslette's participation in the overall scheme was relatively minor. He, however, fully accepts responsibility for his facilitation of the established and unlawful scheme and his role within it.

Another *Qui Tam* Complaint filed in the Northern District of Ohio alleged that Avanir's scheme also included doctors and Avanir employees in California and Illinois.[12]  That complaint also alleged that Avanir's misconduct, including off-label promotion of Nuedexta and violations of the False Claims Act, continued approximately a year and a half after Mr. Hayslette left the company. An additional *Qui Tam* was filed in the Northern District of Georgia in April 2015.[13] That complaint alleged similar practices in other states, including Georgia, Pennsylvania, New York, and New Jersey, where sales representatives were directed and encouraged by Avanir management to encourage doctors to off-label prescribe Neudexta, to spend extravagantly to maintain the doctors' loyalty to Avanir's product, to use and promote false diagnosis codes and fraudulent statements of prior authorization forms, and to forge physician's signatures. In late 2011 or early 2012, one Avanir sales representative was praised by McFadden for altering patient files by writing diagnoses for PBA.

## III.  Guideline Calculation

The base offense level for a violation of Title 18, United States Code, § 371 is a 6.  U.S.S.G. § 2B1.1(a)(2).   The PSR contemplates a 14-level increase for the loss amount under § 2B1.1(b)(1)(H) and an additional two-level increase for the loss amount to a government health

---

[12] Complaint, *United States v. Otsuka Holdings Co., LTD*, No. 1:18-cv-02268, ECF No. 6 (N.D. Ohio May 16, 2019).

[13] Complaint, *United States of America, ex rel., Duane R. Arnold and Mark A. Shipmen v. Avanir Pharmaceuticals*, No. 1:15-cv-01250 (N.D. Georgia Apr. 17, 2015), ECF No. 1.

care program under § 2B1.1(b)(7).[14]  Thus, Mr. Hayslette's total offense level before acceptance of responsibility is 22.  The PSR and the Plea Agreement contemplate a possible 2-level increase for an aggravating role in this matter. Mr. Hayslette has been advised by the government that it *will not* seek such an increase. Thus, it has been omitted from this calculation.

The government has agreed to recommend a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and (b).[15] ██████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████ Paragraph 14 of the Plea Agreement authorizes both the government and Mr. Hayslette to argue for any sentence it believes to be appropriate. For the reasons stated herein, Mr. Hayslette implores the Court to fashion a non-incarceratory sentence.

## IV.    MATTERS FOR THE COURT'S CONSIDERATION

The Guidelines are "effectively advisory." *United States v. Booker*, 543 U.S. 220, 245 (2005).  The Supreme Court advised sentencing courts that, even "[w]ithout the 'mandatory' provision, the [Sentencing Reform] Act nonetheless requires judges to take account of the Guidelines together with other sentencing goals," specifically citing those goals listed in 18 U.S.C. § 3553(a).  *Id*. at 259.  Therefore, a district court must properly calculate and consider the advisory Guidelines' range. *See e.g., Gall v. United States*, 552 U.S. 38, 49 (2007); *United States v. Brown*, No. 20-5308, 2020 U.S. App. LEXIS 34066, at *6 (6th Cir. Oct. 28, 2020); *United States v. Haj-Hamed*, 549 F.3d 1020, 1023 (6th Cir. 2008).

---

[14] PSR at ¶ 15.
[15] *Id.* at ¶ 16.

In *Rita v. United States*, the Supreme Court held that courts of appeal may apply a non-binding presumption of reasonableness to a district court sentence that reflects a proper application of the Guidelines. 551 U.S. 338, 347 (2007).  The Court further held that rather than having independent legal effect, a court of appeal's "reasonableness" presumption "simply recognizes the real-world circumstance that when the district judge's discretionary decision accords with the Commission's view of the appropriate application of 18 U.S.C. § 3553(a) in the mine run of cases, it is probable that the sentence is reasonable."  *Id*. at 350-51.  Therefore, to facilitate appellate review, the Sixth Circuit encourages a sentencing judge to "explicitly state [the] reasons for applying particular Guidelines, and sentencing within the recommended Guidelines range, or in the alternative, for choosing to sentence outside that range."  *United States v. Jones*, 399 F.3d 640, 650 (6th Cir. 2005); *see also Gall*, 552 U.S. at 46; *Haj-Hamed*, 549 F.3d at 1023.

Practically, the Guidelines' "most fundamental flaw is the notion that the complexity of human character and conduct can be rationally reduced to some arithmetic formula."[16]  This is especially true in white-collar cases such as this, where the sentencing range is largely determined by escalating loss enhancements pursuant to Guideline section 2B1.1, an increasingly criticized approach that usually results in draconian advisory Guidelines ranges.  *See United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006), *aff'd,* 301 F. App'x. 93 (2d Cir. 2008) (describing "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense"); *United States v. Parris*, 573 F. Supp. 2d 744, 745, 754 (E.D.N.Y. 2008) (noting that the Guidelines "reflect Congress' judgment as to the appropriate national policy

---

[16] Terry Carter, *Rakoff's stance on the SEC draws fire, praise—and change: The Judge Who Said No*, ABA Journal (Oct. 2013), available at http://www.abajournal.com/magazine/article/judge_jed_rakoffs_stance_on_the_sec_deals_draws_fire_praiseand_ch ange (Last accessed Dec. 13, 2022).

for such crimes . . . [but] this does not mean that the Sentencing Guidelines for white-collar crimes should be a black stain on common sense" and sentencing the defendant "to a term of incarceration of 60 months in the face of an advisory guidelines range of 360 to life").

### A.    Hayslette Should Receive an Additional Downward Departure

The Court may depart from the applicable Guideline range if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." *Koon v. United States*, 518 U.S. 81, 92 (1996) (quoting 18 U.S.C. § 3553(b)).  The Commission provided guidance in making departure decisions by listing certain factors that are "forbidden" bases for departure, "encouraged" bases for departure, and "discouraged" bases for departure. *Id.* at 95.  A loss amount that significantly overstates the seriousness of the offense is "an encouraged basis for departure." *United States v. Corry*, 206 F.3d 748, 751 (7th Cir. 2000).

As the Sixth Circuit noted in *United States v. McBride,* "the Sentencing Commission has provided no further guidance regarding the application of this downward departure.  We agree, however, with the observation by one district court that 'because the loss determination essentially dictates the severity of the sentence, it is this determination that will almost always be the subject of departure scrutiny.'"  362 F.3d 360, 375 (6th Cir. 2004) (quoting *United States v. Roen*, 279 F. Supp. 2d 986, 990 (E.D. Wisc. 2003)).  Therefore, this Court may vary downward and sentence Mr. Hayslette to probation.  Such a sentence is justified because the loss amount applied here significantly overstates the seriousness and involvement of Mr. Hayslette's offense and does not reflect the contextually minor role Mr. Hayslette played compared to his co-defendants.

The PSR makes clear that Mr. Hayslette was directed by his employer, Avanir, and direct supervisor, Mazzucco, to participate in the offense and he did so as an employee of Avanir for the

benefit of his employer.  *See* PSR at ¶¶ 32, 35, 53-54, 57, 61, 63; Plea Agreement at ¶¶ 27, 33, 35, 39, 41, 47; *United States v. Smart*, 518 F.3d 800, 810 (10th Cir. 2008) (mitigating role adjustment applied because defendant "was only follower in scheme"); *see also United States v. Hee*, 515 F. App'x 729, 739 (10th Cir. 2013) (noting other defendants "received variant sentences of supervised release because they were merely followers").  Mr. Hayslette never had authority over others and did not write prescriptions for patients.  This limited role alone warrants a downward departure or variance from the Guidelines.  He was a low-level participant in the established unlawful scheme designed and implemented by others well before he joined Avanir, and he did not directly receive the benefits of the scheme in the way of extravagant salaries or bonuses.  The government alleges that Mr. Hayslette was responsible for an intended loss amount of $1,341,128.46[17] and an actual loss amount of $1,178,460.40 to insurance programs for Nuedexta prescriptions.[18]  However, Mr. Hayslette did not receive anything near these amounts in direct compensation.

For the entirety of Mr. Hayslette's tenure at Avanir, he earned ███████████ in base and incentive compensation (after taxes). For the seven (7) month period between the date Mr. Hayslette was hired and the government's execution of the search warrant (and after which all conduct in the Indictment ceased), Mr. Hayslette's take home pay was ███████, which included a ███████ one-time hiring bonus, and incentive pay in the amount of ███████, which included a ███████ "golden ticket" raffle award that supplemented his earnings. While Mr. Hayslette acknowledges he made a good salary during this period, the take home earnings he received are nowhere near the amounts directly attributable to him, nor consistent with the types of bonuses

---

[17] Recently, the Third Circuit invalidated the use of intended loss as a sentencing enhancement. *See United States v. Banks*, Nos. 19-3812 & 20-2235, 2022 WL 17333797 (3d Cir. Nov. 30, 2022).
[18] *See* Plea Agreement, ECF No. 187, at ¶ 51.

paid in the Insys cases, which were in the hundreds of thousands of dollars for sales representatives.[19]

Plainly, the loss amounts alleged by the government overstate Mr. Hayslette's culpability for his role as the lowest ranking and shortest tenured individual in this conspiracy and are simply not an accurate reflection of Mr. Hayslette's culpability.  These loss amounts greatly exaggerate and do not accurately reflect Mr. Hayslette's role or culpability here.  For these reasons, a sentence in accord with the advisory guideline range in this case would be disproportionately punitive.

Furthermore, the government is attributing loss amounts (intended loss of $1,341,128.46 and actual loss of $1,178,460.40) to Mr. Hayslette that are more than double the amount it assessed to Mr. Hayslette's direct supervisor and co-defendant, Mazzucco ($488,501.23).  As stated, Mazzucco worked for Avanir for years before Mr. Hayslette, and Mazzucco encouraged, directed, and supervised Mr. Hayslette and his predecessors in their interactions with Raheja.  It is fundamentally unfair to hold Mr. Hayslette, the lowest ranking and shortest tenured individual, responsible for significantly higher loss amounts than his supervisor, whose tenure and involvement in the Avanir scheme far exceeded Mr. Hayslette's by several years and who pushed Mr. Hayslette to further engage with Raheja and additional doctors.

Indeed, Avanir had a long-standing relationship with Raheja, and the activities at issue here were part of a much larger nationwide scheme being orchestrated by Avanir.  Mr. Hayslette was a small piece of a much larger conspiracy.  *See United States v. Santos*, 357 F.3d 136, 143 (1st Cir. 2004) (two-level mitigating role adjustment applied because defendant was least culpable of all co-conspirators).  Therefore, an additional downward departure is respectfully warranted.

---

[19] Also, the Court should be aware that the financial information reflected in the PSR was accurate at the time it was drafted, around May of 2022. ███████████████████████████████████████████████████████ ██████████████████████████████████████████████████.  Updated financial information is attached hereto as Exhibit 3.

### B.      Relevant § 3553 Factors

Set forth below are the various sentencing criteria of 18 U.S.C. § 3553(a), and a discussion of their application to Mr. Hayslette and the offenses in question.  Mr. Hayslette did not feel he could question his supervisor's directions.  In fact, he feared that he would lose his job if he failed to maintain Avanir's relationship with Raheja.  This inability to defy his employer is ultimately what led him to participate in this conspiracy.  He should have withdrawn from this conduct, but he did not, in large part because he felt obligated to do as instructed by his employer and feared for his job if he defied directions.

The Court need not be concerned about Mr. Hayslette recidivating. He is more than remorseful for his participation in the offense, and the impact of his conduct has been immense thus far.  He understands that he will have a felony conviction on his record and will endure endless consequences as a result.  Given Mr. Hayslette's personal history and characteristics and the nature of his offense, the defense respectfully submits that these considerations weigh in favor of sentencing him to probation, and not one of incarceration.

### 1.      § 3553(a)(1) – Nature and Circumstances of the Offense and History and Characteristics of the Defendant

Mr. Hayslette firmly acknowledges the seriousness of his offense and the significance of his actions.  However, it is equally important to note that Mr. Hayslette was merely a participant in an unlawful scheme established prior to his hiring at Avanir by his future superiors.  Mr. Hayslette neither led nor organized this scheme.  Rather, his actions were approved, directed, and encouraged by his employer.

As illustrated by letters to the Court from Mr. Hayslette's family and friends, Mr. Hayslette is hardworking and dedicated to his family.  Mr. Hayslette remains gainfully employed as a

territory manager for Forestadent USA. He is anxious to put this period of his life behind him by acknowledging his conduct and accepting responsibility for his role.



These collateral effects of his early plea, and the enormous consequences of his behavior and offense conduct have contributed greatly to Mr. Hayslette's eagerness to address the Court to demonstrate his remorse, what he has learned, and how he intends to lead a law-abiding and productive life moving forward.

**2.    § 3553(a)(2)(A) – Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment**

Mr. Hayslette recognizes that he committed acts that were in violation of the law. However, he respectfully requests that his sentence reflect the considerations of the second enumerated sentencing criteria—to reflect the seriousness of the offense, to promote respect for the law, and to provide a just punishment for the offense. Mr. Hayslette has always been a law-



abiding citizen, as demonstrated by his zero criminal history points.[21]  Mr. Hayslette played a relatively limited role as a salesman working for a company that encouraged him to conduct business in accordance with its unlawful practices established well before Mr. Hayslette's hiring.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████

### 3.    § 3553(a)(2)(B) and (C) – Deterrence and Need to Protect the Public

A sentence of probation has been found to provide adequate deterrence for a wide variety of offenses.  As an example, in *United States v. Howe*, the government appealed a sentence of 24 months of probation and no fine imposed on a defendant convicted of two counts of wire fraud. 543 F.3d 128, 130 (3d Cir. 2008).  The government contended that a sentence of probation was inappropriate given the facts of the case and the recommended Guideline sentence of 18 to 24 months imprisonment. *Id.* at 131-34.  The government specifically contended that the district court had failed to consider the question of general deterrence in imposing a sentence of probation.  *Id.* at 136.  The Third Circuit rejected this argument and affirmed the sentence, finding that the district court had, in fact, adequately considered the question of general deterrence.  *Id.* at 137; *see also United States v. Bragg,* 582 F.3d 965, 973 (9th Cir. 2009) (Smith, J., dissenting) (observing that "deterrence can be sufficiently achieved with probation, fines, and restitution").

███████████████████████████████████████████████████

████████████  Mr. Hayslette is a man of good character who made a misguided and unfortunate choice to become involved with Avanir's practices.  Not only was Mr. Hayslette's involvement in the conspiracy limited in time, ████████████████████████████████████████ he is a

---

[21] PSR at ¶ 89.

person with respect for the law and a desire to make a positive contribution to society.  Given the nature of Mr. Hayslette's limited role in the overall Avanir conspiracy, his good character and lack of criminal history, ███████████████████████████ Mr. Hayslette poses little to no risk of recidivism and zero danger to the public.

### 4.  § 3553(a)(6) – Avoiding Disparities between Similar Defendants

As set forth above, Mr. Hayslette had a limited role in Avanir's nationwide efforts to boost sales of a non-addictive product by facilitating physicians with paid speaking arrangements and other incentives, and as such, he pled guilty to one count.  Hayslette's direct supervisor, who worked for Avanir well before Hayslette and who directed and encouraged Mr. Hayslette's activities pled guilty to one count of conspiracy on the eve of trial and was sentenced to eight months of home confinement, four years of probation, a $5,000 fine, a $100 special assessment, and restitution.

Additionally, several similarly situated defendants in the recent Insys cases involving fentanyl-based painkillers were given non-incarceratory sentences.  For example, one sales representative involved in a kickback scheme related to fentanyl spray prescriptions pled guilty to one count of conspiracy to violate the anti-kickback statute and was sentenced to five years of probation, the first six months of which were to be spent in home confinement, and 150 hours of community service, and restitution.[22]  The scheme involved the defendant's former employer, its owner and founder, several top executives, several sales and marketing supervisors, several healthcare professionals, and at least one other sales representative.[23]  The defendant induced medical practitioners to prescribe her former employer's opioid drug by paying them to participate

---

[22] *See* Sentencing Hearing Tr., *United States v. Levine*, No. 3:17-CR-147, ECF No. 60, (D. Conn. Jul. 19, 2019); https://www.justice.gov/usao-ct/pr/drug-company-sales-rep-sentenced-role-kickback-scheme-related-fentanyl-spray.
[23] *See id.*

in speaker programs typically held at high-end restaurants and designed to gather licensed healthcare professionals who had the capacity to prescribe the drug and educate them about it.[24]  In reality, the events were used as social gatherings and most attendees did not have the ability to prescribe, and no educational component took place.[25]  At times, the sign-in sheets for the events were forged so as to make it appear that the programs had an appropriate audience of healthcare professionals.[26]  The agreed loss amount was $3.2 million.[27]  The defendant's total offense level was 24, before she received a three level reduction for acceptance of responsibility and was sentenced at a level 21.[28]

For similar unlawful conduct, including leveraging a relationship with a prescribing physician, forging sign-in sheets, and using a speaker program to confer unlawful bribes and kickbacks to physicians, another Insys sales representative was sentenced to five years of probation, a $100 special assessment, and forfeiture of any property constituting or derived from gross proceeds traceable of the commission of the offenses for one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371.[29]  The government and PSR in that case recommended a loss calculation of $1,476,908.34 and an offense level 20.[30]  The government also sought a 30-month incarceratory sentence.[31] The sales representative did not receive a reduction for acceptance of responsibility because she did not plead guilty until multiple days into trial, after

---

[24] *See* https://www.justice.gov/usao-ct/pr/drug-company-sales-rep-sentenced-role-kickback-scheme-related-fentanyl-spray.
[25] *See id*.
[26] *See id*.
[27] *See* Sentencing Hearing Tr., *United States v. Levine*, No. 3:17-CR-147, ECF No. 60, (D. Conn. Jul. 19, 2019).
[28] *See id*.
[29] *See* Superseding Indictment, *United States v. Georges*, No. 2:20-CR-157, ECF No.41, (S.D. Ohio Jun. 8, 2021); Judgment, *United States v. Georges*, No. 2:20-CR-157, ECF No. 97, (S.D. Ohio Mar. 9, 2022).
[30] *See* United States' Sentencing Memorandum, *United States v. Georges*, No. 2:20-CR-157, ECF No. 94, (S.D. Ohio Feb. 28, 2022).
[31] *See id.*

the government was nearly halfway through its case-in-chief against her.[32]  Of note, the sales representative received approximately $480,000 in compensation from Insys, including approximately $277,000 in bonuses from fraudulently induced prescriptions.[33]

Another sales representative who was eventually promoted to regional sales director and was involved in the same fentanyl spray prescription scheme was also sentenced to five years of probation, including six months of home confinement.[34]  She also received 300 hours of community service, a $100 special assessment, and a $10,000 fine, but no restitution.[35]  Her plea agreement stated a loss amount between $550,000 and $1.5 million.[36]  She first worked with doctors directly before training other sales representatives how to entice doctors to prescribe more of the drug.[37]  She was later promoted and oversaw and facilitated the payment for speaking programs to doctors.  She was described as a high-level manager and "key player" within the conspiracy.[38]

Yet another sales representative involved in the same scheme also pled guilty and was sentenced to five years of probation, including six months of home confinement, 300 hours of community service, and a $100 special assessment for one count of conspiracy to violate the anti-kickback statute.[39]  She did not receive a fine or restitution.[40]  The defendant increased sales by handling prior authorizations, recommending patients for stronger prescription strengths, and setting up speaker programs.[41]  As with the others, these speaker programs mostly presented

---

[32] *Id.*

[33] *Id.*

[34] *See United States v. Hill*, No. 1:17-cr-00139, ECF No. 25, (S.D. Ala. Jun. 4, 2019); https://www.justice.gov/usao-sdal/pr/insys-regional-manager-pleads-guilty-kickback-conspiracy.

[35] *See* Judgment, *United States v. Hill*, No. 1:17-cr-00139, ECF No. 25, (S.D. Ala. Jun. 4, 2019).

[36] *See* Plea Agreement, *United States v. Hill*, No. 1:17-cr-00139, ECF No. 3, (S.D. Ala. Jul. 11, 2017).

[37] *See* https://www.justice.gov/usao-sdal/pr/insys-regional-manager-pleads-guilty-kickback-conspiracy.

[38] *See id.*

[39] *See* Judgment, *United States v. Perhacs*, No. 1:16-00024, ECF No. 28, (S.D. Ala. Apr. 24, 2018).

[40] *See id.*

[41] *See* Information, *United States v. Perhacs*, No. 1:16-00024, ECF No. 1, (S.D. Ala. Feb. 17, 2016).

repeatedly to the same prescribers or staff, and rarely discussed the drug for which the programs were supposedly being held.[42]  Between April 2013 and May 20, 2015, the defendant made over $700,000 as a result of off-label prescriptions.[43]

A district sales manager involved in the same scheme pled guilty to five counts, including one count of conspiracy to violate the anti-kickback statute, one count of violating the anti-kickback statute, one count of violation of the Health Information Portability and Accountability Act ("HIPAA"), one count of conspiracy to commit honest services fraud, and one count of aggravated identity theft. [44]  He was adjudicated on one count of conspiracy to violate the anti-kickback statute and one count of violating the anti-kickback statute.[45]  He was adjudicated at an offense level 28 and criminal history level II and sentenced to time served (approximately one day), an assessment of $425, and forfeiture of $1,150,000.[46] He did not receive a term of supervision.[47] The sales representative working for this district sales manager pled guilty to six counts, including one count of conspiracy to violate the anti-kickback statute, one count of violating the anti-kickback statute, one count of violation of the Health Information Portability and Accountability Act ("HIPAA"), one count of conspiracy to commit honest services fraud, one count of aggravated identity theft, and one count of health care fraud.[48] He was similarly adjudicated only on one count of conspiracy to violate the anti-kickback statute and one count of violating the anti-kickback statute.[49] The record suggests he spent less than one day in jail and was ultimately sentenced to time served, one year of probation, a $525 assessment, and forfeiture of

---

[42] *See id*.

[43] *See* Plea Agreement, *United States v. Perhacs*, No. 1:16-00024, ECF No. 2, (S.D. Ala. Feb. 17, 2016).

[44] *See* Judgment, *United States v. Roper et al.*, No. 1:16-cr-00542, ECF No. 108, (S.D.N.Y. Mar. 15, 2022).

[45] *See id.*

[46] *See* Sentencing Hearing Tr., *United States v. Roper et al.*, No. 1:16-cr-00542, ECF No. 110, (S.D.N.Y. Apr. 14, 2022).

[47] *See id.*

[48] *See* Judgment, *United States v. Roper et al.*, No. 1:16-cr-00542, ECF No. 102, (S.D.N.Y. Dec. 21, 2021).

[49] *Id.*

$522,462. He was adjudicated at an offense level 26 and criminal history category II.[50] Of note, the sales representative admitted to committing numerous other offenses, including failure to report rental income and stock sale proceeds on his taxes; making false statements to lenders while he was employed as a loan officer; reporting inflated income on credit applications; providing false information on job resumes; driving an uninsured vehicle; and other acts which were redacted in the government's sentencing memorandum in that case.[51]

Finally, another sales manager involved in the same scheme pled guilty to one count of conspiracy to violate the anti-kickback statute.[52] His presentence report calculated an offense level of 22, based on a loss to the government of $1,609,401.[53] He also received a two-point enhancement due to his role as a sales manager.[54] After receiving a three-point reduction for acceptance of responsibility, his total offense level before receiving credit for cooperation was 21. He was sentenced to three years' probation, 200 hours of community service, a $100 special assessment, waived fine, and restitution was satisfied because it was separately ordered and paid in related cases.[55]

Mr. Hayslette's sentence should consider his limited overall role in Avanir's company-wide, years long, practices, and be consistent with those given to other similarly situated defendants charged in this matter and other similar matters. Importantly, Mr. Hayslette should not be punished disproportionately because the government declined to prosecute those who created the unlawful scheme and directed Mr. Hayslette and others to facilitate it.

---

[50] *See* Defendant Fernando Serrano's Pre-Sentence Memorandum, *United States v. Roper et al.*, No. 1:16-cr-00542, ECF No. 96, (S.D.N.Y. Nov. 26, 2021).

[51] *See* Government's Sentencing Submission, *United States v. Roper et al.*, No. 1:16-cr-00542, ECF No. 97, (S.D.N.Y. Dec. 2, 2021).

[52] *See* Judgment, *United States v. Pearlman*, No. 3:17-cr-00027, ECF No. 184, (D. Conn. Dec. 30, 2020).

[53] *See* Sentencing Memorandum on Behalf of Jeffrey Pearlman, *United States v. Pearlman*, No. 3:17-cr-00027, ECF No. 175, (D. Conn. Nov. 12, 2020).

[54] *See id.*

[55] *See* Judgment, *United States v. Pearlman*, No. 3:17-cr-00027, ECF No. 184, (D. Conn. Dec. 30, 2020).

## V.      CONCLUSION

Mr. Hayslette is sincerely remorseful for his conduct and his involvement in the conduct at issue. After leaving Avanir, Mr. Hayslette's subsequent employment at another company was terminated because of his prosecution.  Despite this, he was able to find other employment and has been gainfully employed for the entire duration of this matter.  Despite these efforts, he ███████ ███████████████████████████████ is working to rebuild his life and be an active father to his three adult children.  ███████████████████████████████████ ███████████████████████████████████

For the reasons set forth herein, Mr. Hayslette respectfully requests that the Court exercise its discretion in accordance with 18 U.S.C. § 3553(a) and impose a sentence that is "sufficient, but not greater than necessary," namely twelve months of home confinement and probation.

Dated: April 20, 2023

Respectfully submitted,

/s/ *Marisa T. Darden*
Marisa T. Darden (0098583)
SQUIRE PATTON BOGGS (US) LLP
1000 Key Tower
127 Public Square
Cleveland, OH 44114-1304
marisa.darden@squirepb.com
Telephone: 216.479.8500
Fax: 216.479.8420

*Attorney for Defendant,*
*Gregory Hayslette*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 20, 2023, the undersigned sent a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

<u>/s/ *Marisa T. Darden*  </u>
Marisa T. Darden

*Attorney for Defendant,*
*Gregory Hayslette*