IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.:  1:19CR559 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA E. LIOI |
| | ) | |
| v. | ) | |
| | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM REGARDING |
| | ) | DEFENDANT HAYSLETTE |
| DEEPAK RAHEJA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

The United States of America, by and through its counsel, Michelle M. Baeppler, First

Assistant United States Attorney, and Michael L. Collyer and Megan R. Miller, Assistant United

States Attorneys, hereby submits this memorandum for the Court's consideration in determining

the appropriate sentence for Defendant Gregory Hayslette.  For the reasons set forth below, and

those to be articulated at the sentencing hearing, the United States respectfully submits that a

sentence at the high end of the Guidelines range is sufficient but not greater than necessary to

meet all of the 18 U.S.C. § 3553(a) factors.

## MEMORANDUM IN SUPPORT

The government submits this memorandum with additional analysis of Defendant's offense conduct, the sentencing guidelines calculations, defendant's proposed downward departure, relative culpability of the defendants, and general proportionality.

## I.     OFFENSE CONDUCT

Defendant Hayslette worked as a sales representative at Avanir from July 2015 until September 2016, and he was assigned to the area that included Dr. Raheja's practice during that time.  (R. 187: Hayslette Plea Agreement, PageID 2087).  Hayslette arranged dinner programs for Dr. Raheja, Dr. Sawhny, and others.  (*Id*.).  Hayslette obtained and arranged for signatures from people who did not attend the dinners so that the actual attendees—particularly Dr. Raheja—could spend above the $125 limit.  (*Id*.).  The programs often lacked an educational component and consistently included repeat attendees, like Dr. Sawhny.  (*Id*., PageID 2089).  Dr. Raheja would promote Nuedexta for off-label use at these programs.  (*Id*.).  In addition to his facilitation of Dr. Raheja's paid dinner programs, Hayslette provided benefits to other physicians to induce them to prescribe Nuedexta.  (*Id*.).  Hayslette also obtained patient information from physicians like Dr. Sawhny and Dr. Price to ensure that prior authorizations contained the approved false diagnoses that would ensure insurance coverage of the expensive drug.  (*Id*. at PageID 2090-91).  Hayslette knew that his illegal efforts caused physicians to write more illegal prescriptions for Nuedexta.  (*Id*. at PageID 2091).  Between July 21, 2015, the date of the first Raheja speaker program arranged by Hayslette, and September 26, 2016, Hayslette was responsible for an intended loss amount of $1,341,128.46 and an actual loss amount of $1,178,460.40 to insurance programs for Nuedexta prescriptions.  (*Id*. at PageID 2092).

2

II.     **SENTENCING GUIDELINES COMPUTATION**

The United States has reconsidered its position on the Final PSR's Sentencing Guidelines calculation involving the assessment of a two-level enhancement for an aggravating role pursuant to U.S.S.G. §3B1.1(c).  (R. 255: Final PSR of Gregory Hayslette, PageID 2960).  This remains a close call, but on balance the government believes that it does not apply and offers its perspective on this in section IV below.

III.    **HAYSLETTE IS NOT ENTITLED TO A DOWNWARD DEPARTURE ON THE BASIS THAT LOSS OVERSTATES THE SERIOUSNESS OF THE OFFENSE**.

Hayslette asks the Court to grant a downward departure based on his argument that the loss amount overstates the seriousness of the offense.  (R. 360: Hayslette's Sentencing Memo, PageID 5205-07).  But Hayslette agreed in his plea agreement that no such departure applied. (R. 187: Hayslette Plea Agreement, PageID 2084) ("the parties agree that no other specific offense characteristics, Guideline adjustments or Guideline *departures* apply") (emphasis added).

Even if the Court considered this a variance request, the Court should reject it.  Hayslette earned substantial income from the scheme, and the bonus structure specifically motivated him to engage in the kickback scheme with particular zeal.  And he was aware of exactly how much loss his conduct was inflicting on the federal government as he worked to ensure—through illegal means such as accessing patient information to fill out prior authorizations with false diagnoses—that the federal health insurance programs would pay for the expensive drug.  There is no doubt that the federal programs suffered the loss and Hayslette knew they were incurring it.

The Court should also find Hayslette's comparison to co-defendant Mazzucco inapt for the reasons we explain below, which include the relative evidence against both defendants and the egregious conduct that Hayslette alone engaged in.

3

IV.     **RELATIVE CULPABILITY OF DEFENDANTS**

There is no universally accepted definition for "culpability" in this context.  For example, if the Court only takes into account offense conduct, then the ranking necessarily excludes other important factors like acceptance of responsibility and substantial assistance to authorities, which would produce a different result if they were included.  We will address these factors at the sentencing hearing.  We write here on other potential culpability factors: (a) relative profit from the offense;[1] (b) relative loss caused by the offense conduct; (c) length of time in the conspiracy; and (d) specific acts promoting the conspiracy.

A.     **Relative Profit**

The physician defendant profits were relatively easy to gauge.  Dr. Raheja was the speaker who wrote the most (by far) Nuedexta prescriptions in return for $1,500-per-dinner fees while Drs. Sawhny and Price wrote a much smaller number of prescriptions in return for free dinners and some office assistance.  But the bonus structure at Avanir was too opaque to give a clear picture of how much Dr. Raheja's prescribing featured in Mazzucco and Hayslette's pay.  One thing we have determined from the pay structure is that it appears that Dr. Raheja was more important to Hayslette's pay than he was to Mazzucco.  This inheres in the fact that Dr. Raheja was the most prolific prescriber in Hayslette's area of responsibility and featured prominently into Hayslette's bonus, as Mazzucco at one point reassured Hayslette: "A monster Q4 bonus and a PCLUB campaign is in play for 2016."  (R. 1, Indictment, PageID 12).  This was not an isolated statement or theme as Hayslette himself acknowledged in his own words as part of his

---

[1]     *See, e.g.*, U.S.S.G. §3B1.1(c), Background (noting that people who profit more tend "to present a greater danger to the public and/or are more likely to recidivate").

business review:

> I just came off a great quarter and believe I will finish number 1. I should
> make close to $72,000 when you factor in ICP, SPIFF, and MDM.
> Outstanding! I'm looking forward to finishing in the top 10 for Q1 and having
> nice consistency in the top 10/25 for future quarters. I plan on doing well with
> Nuedexta for the entire year, launching AVP-825 successfully during that
> time too, and winning a spot in the coveted president's club.

(Govt. Ex. 237: Hayslette Q1 Business Review 2016, p. 6) (submitted under seal).

Dr. Raheja's impact was more diffuse for Mazzucco, who as a regional manager had numerous

sales representatives besides Hayslette whose performance could affect Mazzucco's pay.

**B.      Relative Loss Caused**

Relative loss is a difficult thing to measure with precision.  There is the rough assessment

inherent in the loss amounts that Mazzucco and Hayslette were held responsible for: the

government agreed that Mazzucco was responsible for $488,501.23 of loss attributable to

prescribing by Drs. Raheja, Sawhny, and Price while Hayslette was held responsible for

$1,178,460.40.  The difference is a function of the government's evidence.  The government had

a wealth of evidence against Hayslette, including text messages the government obtained from

his seized phone and numerous witnesses who interacted directly with him.  Thus, the

government was in a position to prove that his participation in the conspiracy began no later than

the first dinner program he arranged for Dr. Raheja.  For Mazzucco, the government did not

seize his phone.  Mazzucco did not interact directly with physician staff members and dinner

attendees the way that Hayslette did.  This evidence gap led to an agreement that the government

could prove Mazzucco's involvement began no later than December 2015.  This is not to say that

Mazzucco definitively became culpable at that point, only that the government's evidence was

not nearly as clear on this point as it was for Hayslette.

### C.      Time in the Conspiracy

The relative loss metric feeds directly into the next measure concerning length of time in the conspiracy, and this one too is more difficult to discern for co-defendant Mazzucco because of the nature of the offense and, more importantly, the limits of the government's evidence. Mazzucco worked at Avanir longer than Hayslette and may have been involved in the conspiracy longer than Hayslette.  Neither Mazzucco nor Hayslette recruited Dr. Raheja into the speaker bureau.  And Dr. Raheja's prescribing was prodigious before Hayslette joined Avanir—to borrow their own words, Dr. Raheja was already a "monster" before Hayslette, he just got bigger during the Hayslette era.  (R. 1: Indictment, PageID 11).  The evidence of Hayslette's time in the conspiracy is much clearer, however, which included his very explicit text messages from early on in his employment at Avanir.

### D.      Specific Acts of Promotion

Mazzucco's main act of promotion was assisting Hayslette in obtaining funding for Dr. Raheja's dinner programs.  (R. 1: Indictment, PageID 30-31).  Hayslette, however, not only led that effort—he did everything else necessary to ensure the scheme's success.

#### 1.      Identity Theft – Forged Signatures

One factor that elevates Hayslette's conduct over Mazzucco's was the unique way that Hayslette maximized Dr. Raheja's dinner program benefits through identity theft.  When Hayslette did not have enough attendees for a dinner or he wanted additional ghost attendees so that Dr. Raheja could enjoy a more lavish dinner, he used two different methods to accomplish this.  First, he would forge signatures.  In the government's investigation, which included interviewing numerous people listed as dinner program attendees, the government discovered that approximately 32 signatures were outright forgeries perpetrated by Hayslette.  We cannot underscore the significance of this act enough—it is inherently wrong to steal identities,

particularly in furtherance of the kickback scheme, but this appeared to be Hayslette's innovation.  While there may have been a Raheja "playbook" in place before Hayslette joined Avanir, this appeared to be a play that Hayslette added on his own.

In addition to the egregious nature of this act in furtherance of the scheme, it appears that this was not Mr. Hayslette's first time engaging in this kind of conduct.  The government learned from Dr. Sawhny's counsel that Hayslette had previously lost employment and licensing by forging a client's signature: "Hayslette prepared two separate Letters of Authorization on which he signed client signatures without their authorization or approval. Hayslette stipulated to the fact that he forged customer signatures and consented to penalty by a New York Stock Exchange Hearing Panel. By unanimous vote, the Hearing Panel found him guilty of attempted misappropriation and forgery, and imposed the penalty of 'censure and a permanent bar from membership, allied membership, approved person status, and from employment or association in any capacity with any Exchange member or member organization.'" (R. 192: Defendant Sawhny's Motion for Issuance of Subpoenas, PageID 2114) (citations omitted); see also (R. 192-5: NYSE Hearing Panel Decision, PageID 2179) (finding that Hayslette "attempted to misappropriate securities belonging to two customers of his member firm employer; falsely signed the names of customers on two documents filed with his member firm employer; and effected a transfer of securities out of a joint account without the authorization of one of the account holders").  The government notes that among the numerous letters filed in Hayslette's support, no one appears to mention his employment at Edward D. Jones & Co., Inc.  That omission appears to be intentional.

Incredulously, in his first Sentencing Memo to this Court, Hayslette *again* forged a signature in an attempt to benefit himself, this time forging his ex-wife's signature on a letter he

drafted in her name (or more accurately, in her former name, not her current married name).

We have no such evidence for any of the co-defendants.  And in addition to its relevance to the proportionality analysis, showing that Hayslette uniquely engaged in this egregious conduct, it also speaks to at least two 3553(a) factors, notably the nature and circumstances of the offense as well as Hayslette's history and characteristics, and the need to deter him from engaging in this kind of conduct in the future.  18 U.S.C. §3553(a)(1) and (2)(B).

One final point on identity theft.  The government agreed to dismiss the Aggravated Identity Theft counts as part of its Plea Agreement with Hayslette.  (R. 187: Plea Agreement of Gregory Hayslette, PageID 2082).  We reached this agreement before we knew that Hayslette had previously lost employment and been sanctioned for forging a signature and obviously before we knew that he forged his ex-wife's signature on a letter of support.  The Court should consider the benefit Hayslette has received in dismissal of these counts when it balances all of the other facts in connection with the sentencing in this case.

2.      Signatures Obtained Under False Pretenses

Hayslette also had a regular practice of obtaining signatures from employees at various doctors' offices under false pretenses.  When Mr. Hayslette visited offices and brought coffee or other food items, he would ask recipients to sign a "receipt," which was in fact a dinner attendance sheet.  Numerous witnesses informed the government that their actual signatures appeared on dinner program attendance sheets but that they did not actually attend the dinner in question (some witnesses had never attended a dinner, and it was comparatively easier for them to confirm that their signature for a dinner program was obtained under false pretenses, while other actual attendees could at least verify based on the dinner venue that they had never been to that location).  The government identified approximately 68 such signatures on dinner program sign-in sheets.  In this way, Defendant Hayslette was successful in increasing the number of

dinner programs that Dr. Raheja could get paid for—indeed, every single month of the Gregg Hayslette era had more dinner programs than any other month in Dr. Raheja's speaking history. See Govt. Trial Ex. 720 (submitted under seal).  This program increase, not coincidentally, culminated in the single highest amount of prescriptions that Dr. Raheja had ever written.  Govt. Trial Ex. 720 (showing that in Dec. 2015, Dr. Raheja wrote approximately 400 Nuedexta prescriptions, with the next closest month being approximately 275 in September 2014) (submitted under seal).

### 3.    Conduct that Violated HIPAA

Mr. Hayslette also worked hard, and illegally, to ensure that insurance paid for the Nuedexta prescriptions.  Hayslette violated HIPAA by participating in "screening days" (accompanying physicians in their examinations of patients) and obtaining patient information so that he could fill out prior authorizations in a way that guaranteed insurance would pay for Nuedexta.  Indeed, Hayslette had prior authorizations—with specific patient information—in his home and car when law enforcement executed a search warrant.

### 4.    Off-Label Promotion

Hayslette also appeared to promote Nuedexta off-label, discussing off-label promotion with Dr. Raheja and providing articles regarding Nuedexta and pain to Dr. Sawhny.

### 5.    Recruitment of Other Physicians

Mr. Hayslette recruited new members into the conspiracy, including Dr. Sawhny and Dr. Price.  Before Mr. Hayslette joined Avanir and was assigned to the sales territory for Drs. Sawhny and Price, neither physician had previously written a prescription for Nuedexta.  Once Mr. Hayslette began calling on them, however, prescription data confirms that Dr. Sawhny wrote his first prescription for Nuedexta around November 17, 2015, and Dr. Price wrote his first prescription for the drug around November 22, 2015.  With Mr. Hayslette's assistance, and to

9

facilitate the approval of and reimbursement for these prescriptions, Drs. Sawhny and Price also

submitted prior authorizations that contained false diagnoses of PBA.  That Mr. Hayslette

successfully convinced additional physicians to write for Nuedexta demonstrates the degree to

which Mr. Hayslette "influenced the exercise of decision-making authority" by these physicians

as well as Mr. Hayslette's integral role in the conspiracy.  *See* U.S.S.G. § 3B1.2(b), App. N.

3(C)(iii).

        **E.**       **Role Analysis**

These facts beg the question of how the Court should consider and compare their

respective roles.[2]  The government continues to believe that Hayslette is the second most

culpable individual charged in this conspiracy.  Within a month after being hired, Hayslette fully

embraced the kickback relationship with Dr. Raheja.  Hayslette hosted his first speaker's bureau

program with Dr. Raheja on or about July 21, 2015.  Subsequently, from August 2015 through

February 2016, during Mr. Hayslette's tenure as Dr. Raheja's sales representative, Dr. Raheja

received more money per month in speaker's bureau payments than he had in any month in his

previous four years speaking for Avanir.  No other Avanir sales representative had anywhere

near the success in encouraging Dr. Raheja to write Nuedexta prescriptions in exchange for

honoraria.

In the final analysis, while the government reserved the right to seek an aggravating role

enhancement for Hayslette and Probation assessed one (R. 255: Final PSR of Gregory Hayslette,

---

[2]     Section 3553(a)(6) refers to national disparities rather than disparities among co-defendants, but a district judge "may exercise his or her discretion and determine a defendant's sentence in light of a co-defendant's sentence."  *United States v. Presley*, 547 F.3d 625, 631 (6th Cir. 2008).

PageID 2959), the government now believes that Hayslette, similar to the Court's finding for

Mazzucco, does not merit a role enhancement.

## V.  PROPORTIONALITY WITH OTHER SIMILARLY SITUATED DEFENDANTS IN OTHER CASES

Hayslette compares his conduct with defendants in six other cases, citing 18 U.S.C.

§3553(e)(6).  (R. 360: Hayslette's Sentencing Memo, PageID 5211-15).  The government

already addressed several of these Insys cases, including distinguishing characteristics that

should remove any concern that a disparity between this case and those is "unwarranted."

(R. 338: Sentencing Memo re Mazzucco, PageID 4712-15).  But we also hasten to add that

national disparity concerns are but one of seven factors listed in 18 U.S.C. §3553(e).  *Kimbrough*

*v. United States*, 552 U.S. 85, 108 (2007).  A sentence within the properly calculated Guidelines

range addresses the purpose of combatting national disparity.  *United States v. Volkman*,

797 F.3d 377, 400 (6th Cir. 2015).

## VI.    CONCLUSION

For the foregoing reasons and consistent with the parties' Plea Agreement, the United States respectfully submits that a sentence of incarceration at the high end of the Guidelines range of 18-24 months is sufficient but not greater than necessary to meet all of the 18 U.S.C. § 3553(a) factors.

Respectfully submitted,

MICHELLE M. BAEPPLER
First Assistant United States Attorney

/s/ Michael L. Collyer
Michael L. Collyer (OH: 0061719)
Megan R. Miller (OH: 0085522)
Assistant United States Attorneys
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3744/3855
Michael.Collyer@usdoj.gov
Megan.R.Miller@usdoj.gov